**DEAN WITTER REYNOLDS INC.,**
Plaintiff–Appellant,

v.

**The VARIABLE ANNUITY LIFE INSURANCE COMPANY,**
Defendant–Appellee.

No. 02–1418.

United States Court of Appeals,
Tenth Circuit.

June 29, 2004.

Stuart N. Bennett (Eric B. Liebman and Jeffrey A. Aramowicz with him on the briefs), Brega & Winters, P.C., Denver, CO, for Plaintiff–Appellant.

M. Gabriel McFarland, Bieging Shapiro & Burrus LLP, Denver, CO, for Defendant–Appellee.

Before SEYMOUR, McKAY, and McCONNELL, Circuit Judges.

McCONNELL, Circuit Judge.

In a world of instantaneous electronic fund transfers and online financial transactions, one would think that the old problems of disappearing checks, uncertain mail deliveries, and unknown thieves—long the staple of law school hypotheticals—would cease to have much practical significance. In this case, however, Defendant, the Variable Annuity Life Insurance Company ("VALIC"), opted to do it the old-fashioned way: It sent two checks via the postal service to its customer's broker in Houston, Texas. True to form, an unknown thief intercepted one of the checks and used it to open a fraudulent account in Los Angeles. As a result of vacations, horse-and-buggy procedures, and (allegedly) willful foot-dragging and miscommunications, payment was not stopped on the stolen check until some two months after it was mailed—by which time the thief had made away with most of the proceeds. In determining who should bear the loss, this Court has found it necessary to blow the dust off of ancient common law doctrines of negotiable instruments, bailments, and assignability of choses in action. In tribute to the enduring character of the common law, we apply these legal concepts to this twenty-first century dispute.

## I. Background

The facts in this case are largely undisputed, and we record them essentially as stated by the district court.

In September of 1998, Mrs. Merle Bass, a customer of VALIC, requested that the two accounts she maintained be liquidated and the proceeds sent to Dean Callender, a securities broker at Dean Witter's Houston office. To accomplish this transfer, Mrs. Bass filled out the appropriate "Rollover/Transfer Out Request Form" ("the Form").

As a result, VALIC generated two checks. The first ("Check I") was cut on September 29, 1998, for the amount of $211,041.66. The second ("Check II") was cut on September 30, 1998, for $126,947.59. Both checks were made payable to "Morgan Stanley Dean Witter FBO: Merle B. Bass" and contained Mrs. Bass's social security number.

Thereafter, Mrs. Bass left the country on a three-week vacation. Shortly after her return, on November 2, 1998, she called the Dean Witter office in Houston and discovered that the funds had not arrived. This prompted her to contact VALIC, which informed her that the checks had been mailed as per the instructions on the Form. According to Mrs. Bass, during this conversation she asked that VALIC stop payment on both checks. In any event, it is undisputed that on November 12, 1998, someone from Dean Witter's Houston office spoke to VALIC and requested stop payments on both Check I and Check II.

VALIC issued the stop payment order on November 16, 1998, and payment on Check II was stopped. Check II was reissued and the funds were eventually received by the Houston office. As to Check I, however, VALIC was unable to fulfill the stop payment request because the check had already been negotiated on November 9, 1998, and paid by VALIC's bank on the following day.

In December, Dean Witter became aware of a suspicious account opened in its Los Angeles office. Investigation revealed that the account was opened in the name of "Mevle Bass" using Merle B. Bass's social security number, which was printed on the face of the check. Someone—presumably the person who stole the check—had been depleting the account since November 24, 1998. Dean Witter promptly froze the account, but by that time, over $160,000 had been stolen.

Dean Witter reimbursed Mrs. Bass for her loss, and in exchange Mrs. Bass assigned her claims to Dean Witter. Dean Witter then initiated this action against VALIC in the District of Colorado pursuing claims under theories of: (i) misdelivery of bailment, (ii) breach of contract, (iii) fraud, (iv) promissory estoppel, (v) the Colorado Consumer Protection Act (C.R.S. §§ 6-1-101 *et seq.* "CCPA"), and (vi) breach of fiduciary duty. The contract, bailment, and fiduciary claims are all premised on Dean Witter's assertion that its non-receipt of the checks constitutes failure by VALIC to perform its duties under the various agreements entered into with Mrs. Bass. The fraud, promissory estoppel, and CCPA claims likewise have a common point of departure. In essence, Dean Witter claims that VALIC knew or should have known that Check I had been negotiated on November 10, 1998, yet it continued to reassure Mrs. Bass that her stop payment request would be processed and honored. According to Dean Witter, Mrs. Bass relied on this information and did not further pursue the matter with VALIC until November 30. These dates are significant because the thief did not begin to deplete the account until November 24. Dean Witter argues that had VALIC provided Mrs. Bass with accurate information regarding Check I, the account would have been frozen prior to the thief's depletion of the funds.

VALIC, on the other hand, maintains that responsibility for the theft lies with Dean Witter. VALIC argues that since the check was negotiated by Dean Witter and the fraudulent account was opened in its Los Angeles branch with Mrs. Bass's social security number, Dean Witter should have realized that the check missing from its Houston office was used to open an account in its Los Angeles office. VALIC thus argues that Dean Witter was in the better position to prevent the theft.

The district court largely agreed with VALIC's view of the case and granted it summary judgment on all claims. We agree with its analysis of the fiduciary claim and affirm its decision as to that claim. We also affirm its judgment with respect to the bailment claim. For reasons discussed below, however, we reverse the district court's conclusion as to the fraud, estoppel, CCPA, and breach of contract claims, and remand for further proceedings.

 We emphasize that this case comes to us on appeal from the district court's grant of summary judgment in favor of defendant VALIC on all claims. Thus, the issue is not which party ultimately will or should prevail, but whether there are any disputed questions of material fact, drawing all reasonable inferences in favor of Dean Witter as the party opposing the grant of summary judgment. We review the grant of summary judgment *de novo*, applying the same standards used by the district court. *Midland Mortg. Co. v. United States Fidelity and Guar. Co.*, 301 F.3d 1277, 1279 (10th Cir. 2002). Because this case reaches us pursuant to diversity jurisdiction, we apply Colorado law as if this case were brought in Colorado state court. *Id.*

## II. Liability for Misdelivery

We begin with the contract claim because the district court's analysis of that issue guided its thinking about the entire case. Further, as explained below, our interpretation of the contract depends in part on our analysis of the bailment claim.

The district court interpreted the Form signed by Mrs. Bass as a contract requiring:

VALIC to transfer her funds by mailing them to:

Morgan Stanley Dean Witter

FBO: Merle B. Bass

The Callenders

1990 Post Oak Blvd., Suite 2000

Houston, Texas 77056.

Op. 2.

Proceeding on this assumption, the court considered whether VALIC failed to perform its duties under this contract. In granting VALIC summary judgment the court reasoned:

[T]he evidence does not show that VALIC failed to perform its promised service with respect to the checks. The instructions of Mrs. Bass on the Rollover/Transfer Out Request Form directed VALIC to transfer the funds by mailing them to the address set forth on the form. The evidence submitted by VALIC shows that the checks were made payable to the proper party and addressed correctly. VALIC asserts that it mailed the checks, and there is no evidence that it did not. The fact that the checks did not arrive at Dean Witter's Houston office does not prove that VALIC failed to follow Mrs. Bass's instructions.... The plaintiff's evidence with respect to delivery of the checks does not provide a sufficient basis for its claims for violation of the CCPA, breach of contract, promissory estoppel, or breach of fiduciary duty.

Op. 6.

As an initial matter, we are somewhat hesitant to adopt the district court's inter-

pretation of the contractual agreement between Mrs. Bass and VALIC as memorialized in the Form. First, while the Form may be construed as instructing (or at least authorizing) VALIC to transfer her funds by mail, it does not imply that placing a check in the mail will satisfy any obligation created by Mrs. Bass's deposit of funds with VALIC. Moreover, the Form is silent with regard to the allocation of risk while the payment is in transit. Nothing in the contract leads us to understand that by filling out the payee's mailing address Mrs. Bass assumed the risk of the check being stolen en route.

■■ Parties are presumed to contract with reference to existing principles of law, and in the absence of clear contractual language the relationship is governed by the rules mandated by law. *See* 11 *Williston on Contracts* § 30:19 (4th ed.1997); *see also* C.R.S. § 4–1–102 (unless specifically modified by contract, Colorado's U.C.C. rules apply). For this reason, the nature of the legal relationship between Mrs. Bass and VALIC is relevant to understanding the contract. In its motion for summary judgment, Dean Witter argued that VALIC was Mrs. Bass's bailee and should be liable for misdelivery of bailment. If we were to accept Dean Witter's theory, the gap in the contract would be filled by the common law rules governing the bailee's obligation to redeliver the bailment. VALIC, however, responded that the relationship between a depositor and a financial institution is not that of bailor/bailee but of creditor/debtor. Under VALIC's interpretation, the contract should be read in light of the law governing a debtor's obligation to remit payment to the creditor. We find that under either construction, the district court's grant of VALIC's summary judgment motion on the contract claim was improper.

■■ Dean Witter presented two versions of its bailment claim. First, in briefs filed in district court in support of its motion for summary judgment, Dean Witter argued that the check was the *res* of the bailment. In argument before the district court, Dean Witter argued principally that the funds themselves were bailed to VALIC. *Id.* at 145–46. As we understand either version of Dean Witter's argument, a finding that VALIC was Mrs. Bass's bailee would subject VALIC to liability under the onerous standards for misdelivery of bailment. "*Any* unauthorized delivery of bailed property by a bailee—even delivery to the wrong person resulting from the bailee's good faith mistake—constitutes a conversion." *Fireman's Fund Ins. Co. v. Wagner Fur, Inc.,* 760 F.Supp. 1101, 1105 (S.D.N.Y.1991) (emphasis in original), *citing Restatement (Second) of Torts* § 234 & cmt a. Further, "bailees are 'not only liable for losses occasioned by their negligence, but for those which arise from innocent mistakes in the delivery of goods to persons not entitled to receive them.'" *Id., quoting Bank of Oswego v. Doyle,* 91 N.Y. 32, 42 (1883).

The district court, however, found that no bailment was created and dismissed the claim in an oral ruling from the bench. Its dismissal was premised on two assumptions: first, that the check itself does not constitute personal property and therefore is not the proper subject of a bailment, and second, that with respect to the funds, VALIC was Mrs. Bass' debtor, not her bailee. Dean Witter challenges this ruling on appeal.

■■ While early common law doctrine held that only corporeal personal property could be the subject of a bailment, for nearly a century it has been "well settled . . . that there may be a bailment of incorporeal as well as corporeal personalty. . . . Thus, there may be a bailment of

negotiable notes, bonds, corporate stock and insurance policies as well as horses, watches or furniture." Armistead M. Dobie, *Handbook on the Law of Bailments and Carriers* 20 (1914).

A check is undoubtedly a negotiable instrument, *see Wedge Mines Co. v. Denver Nat'l Bank,* 19 Colo.App. 182, 73 P. 873, 875 (1903); C.R.S. § 4–3–104 (check is a negotiable instrument under the U.C.C.), and the check itself, which can be assigned to others, takes on commercial significance apart from the underlying funds it represents. *See, e.g., Meyers v. Johanningmeier,* 735 P.2d 206 (Colo.Ct.App.1987) (in general, a holder in due course takes the instrument free from all claims and defenses of any party to the instrument); C.R.S. § 4–3–301, 3–302 & 3–305 (defining rights of holders in due course under the U.C.C.). Thus, there is little doubt that under Colorado law, if A gives B a check to deliver to C, B is A's bailee and can be liable for misdelivery.

 VALIC, however, is correct to point out that the relevant question is not whether a check in the abstract can be bailed, but the status of *this* check as it relates to Mrs. Bass's funds deposited with VALIC. After all, the check was drawn up by VALIC, and payable from VALIC's funds. It is far from clear that this check is best characterized as a bailment of Mrs. Bass's funds rather than as VALIC's attempt to satisfy its debt to Mrs. Bass. The answer to this question depends largely on the common law status of deposits with financial institutions. Some 140 years ago, the United States Supreme Court summarized the considerations as follows:

> All deposits made with bankers may be divided into two classes, namely, those in which the bank becomes bailee of the depositor, the title to the thing deposited remaining with the latter; and that other kind of deposit of money peculiar to banking business, in which the depositor, for his own convenience, parts with the title to his money, and loans it to the banker; and the latter, in consideration of the loan of the money and the right to use it for his own profit, agrees to refund the same amount, or any part thereof, on demand.

*Marine Bank v. Fulton Bank,* 2 Wall. 252, 69 U.S. 252, 256, 17 L.Ed. 785 (1864). The common law thus conceptualized a general deposit as a loan of the funds to the financial institution. Unlike a bailment, a general deposit passes title to the financial institution, which is required to repay the loan from its own funds upon demand.[1]

 In general, the law presumes that deposits made to financial institutions in the ordinary course are general deposits; the burden rests on the depositor to prove otherwise. *See Peoples Westchester Savings Bank v. FDIC,* 961 F.2d 327, 330 (2d Cir.1992); *Keyes v. Paducah & I.R. Co.,* 61 F.2d 611, 613 (6th Cir.1932). "A special deposit is one made under an express or clearly implied agreement that is for some particular purpose, while a general deposit includes all others forms of de-

---

1. This distinction is of ancient origin and appears in the Mishna, a second century compilation of Jewish law. The Mishna teaches:

 One who deposits monies with a money exchanger: If they are bound together [and sealed], the exchanger may not lend them out. Therefore if they are lost [through no negligence of the exchanger] he is not liable for the loss. If the money was delivered as loose coins, the exchanger may lend them out. Therefore if they are lost, the exchanger is liable [as a debtor]. However, if one deposits coins with a householder, whether they are bound or loose, the householder may not lend them out, therefore he is not liable for their loss [except in cases of his own negligence].

 Mishna, Bava Metzia Chapter 3 § 11 (as interpreted by B. Talmud, Bava Metzia 43a; C. Saiman, trans.).

posits." 5B *Michie on Banks and Banking* § 328, at 533 (2002). Thus, while courts have held that monies placed in accounts for certain specific purposes, such as escrow accounts, are special deposits, *see* 9 *N.Y. Jur.2d, Banks and Financial Institutions* § 263; 5B *Michie* § 332 at 552–55, in the ordinary course, title to deposited funds passes to the bank and a debt in the amount deposited is created between the financial institution and the depositor. *See* 5B *Michie* § 328, at 535–37. Dean Witter has not pointed to any agreement, express or implied, indicating that the funds were held specially, and we therefore conclude that Mrs. Bass's account with VALIC is properly characterized as a general deposit. It follows that VALIC's attempted transfer of funds by means of mailing a check to Mrs. Bass's broker was not the delivery of a bailment but an attempt to satisfy its outstanding obligations as Mrs. Bass's debtor.

But this does not mean that VALIC bears no legal responsibility for misdelivery of the check. Just as a bailee has the duty to redeliver the bailment at the instructions of the bailor, a debtor is obliged to remit payment to the creditor or his order. Based on the record as it stands, we conclude that the district court erred in granting summary judgment in favor of VALIC on the contractual claim.

 In essence, the district court held that the contract between Mrs. Bass and VALIC required only that VALIC mail the check in accordance with her mailing instructions—not that funds actually be transferred to her in satisfaction of her deposit. We think this takes too narrow a view of the contractual relation between Mrs. Bass and VALIC. In general, a debt is discharged not when the debtor mails a check, but when the creditor negotiates the check. *Denver Elec. & Neon Corp. v. Phipps, Inc.,* 143 Colo. 530, 354 P.2d 618,

623 (1960); *see also Nguyen v. Calhoun,* 105 Cal.App.4th 428, 129 Cal.Rptr.2d 436 (2003) (in general, the deposit of a payment check in the mail does not constitute payment; debtor assumes the risk that the deposited payment will be delivered and received by the creditor). If a householder attempts to pay the electric bill by mailing a check, he continues to be liable if the check is delayed or lost.

 This presumption may be rebutted by evidence demonstrating a specific course of dealing or express agreement to the contrary. *See Werne v. Brown,* 955 P.2d 1053 (Colo.Ct.App.1998). VALIC argues, in effect, that the Form executed by Mrs. Bass constituted an express agreement that its obligations to Mrs. Bass would be satisfied by mailing the check to her broker, even if the check was never delivered. We do not read the Form that way. Contracts are presumed to be drafted with reference to existing principles of law, and in general, intent to modify applicable law by contract is effective only where expressly stated. *See* 11 *Williston on Contracts* § 30:19 (4th ed.1997). To be sure, the contract contains mailing instructions, and thus authorizes VALIC to use the mails for the fund transfer. But nothing on the Form suggests any intention to shift the risk of misdelivery from VALIC to Mrs. Bass, or suggests that VALIC's debt was satisfied upon the act of mailing the check. Thus, even if VALIC is correct that the Form itself imposed only the obligation to "send," and not to "deliver," the check, we do not believe that VALIC's duty to repay Mrs. Bass on demand was thereby exhausted.

We would come to the same conclusion even if we were to assume that VALIC's duties as debtor were fully subsumed within the four corners of the Form. It is undisputed that, at a minimum, VALIC was contractually obliged to send the

check to Mrs. Bass's brokers. VALIC submitted evidence that in the ordinary course of its business, checks are generally placed in a lockbox where another company, Lonestar, picks up the checks, seals them in envelopes, stamps and addresses them, and then delivers the checks to the postal service. Because Lonestar maintains no record of the number of checks taken from the lockbox, however, there is no way to determine whether all the checks deposited by VALIC were in fact processed by Lonestar. Thus, VALIC can offer no conclusive evidence that Check I was placed in the box, or even if it was, that Lonestar successfully prepared it for mailing and delivered it to the postal service. For these reasons, VALIC is not entitled to any of the favorable legal presumptions that attach when an item is placed in the mails. *See Campbell v. IBM Corp.*, 867 P.2d 77, 80 (Colo.Ct.App.1993) ("[W]hen the evidence is conflicting as to whether the letter was mailed initially, the presumption does not arise and the conflict must be resolved by the trier of fact."); *Witt v. Roadway Express*, 136 F.3d 1424, 1429–30 (10th Cir.1998) (properly addressed piece of mail creates a rebuttable presumption of receipt only when "placed in the care of the postal service").

Dean Witter, on the other hand, submitted evidence that its Houston office has no record of processing Check I, though such a record would be kept in the ordinary course of its business. Dean Witter further submitted the affidavits of the Callenders, the securities brokers in the Houston office. Each deponent affirmed that he or she did not receive Check I. Further, in response to VALIC's motion for summary judgment, Dean Witter submitted affidavits from Ginny Holliday, the Houston branch manager, Richard Gilmore, the mail clerk, and Lourdes Capulin, the funds-received clerk.[2] Like the Callenders, these employees all denied receipt of the check. Specifically, Mr. Gilmore and Ms. Capulin, the two employees responsible for physically handling the incoming checks, each issued a sworn statement that they did not: (i) process Check I, (ii) maintain it in their personal possession, or (iii) remove it from the Houston office. Based on the absence of any records for Check I, Ms. Holliday averred that "I know that the Houston Office never received" Check I. These affidavits thus support an inference that Dean Witter did not receive Check I at its Houston office.

Undisputed evidence thus supports the conclusion that VALIC prepared the check for mailing, but that it disappeared before being processed by Dean Witter in Houston. We simply do not know when or where, in between these two points, the check was stolen. Nothing in the record dispels the possibility that the check was taken before it reached the hands of the postal service. A jury might well infer from evidence of VALIC's practices that VALIC properly "mailed" the check, but this is only an inference. On a motion for summary judgment, all reasonable infer-

---

2. On appeal, as before the district court, VALIC raises a variety of arguments contending that the affidavits of Ms. Holliday, Mr. Gilmore and Ms. Capulin should be ignored by the Court for failure to comply with certain of the Federal Rules of Civil Procedure. The district court did not rule on these claims, nor does its opinion indicate whether it accepted the affidavits. In any event, our reversal on this issue does not rely solely on the admissibility of these depositions. Even assuming the affidavits are not properly before the Court, we find VALIC's inability to demonstrate that it mailed the checks combined with the depositions of the Callender family (the admissibility of which is not contested) sufficiently create an issue of fact for the jury. *See Campbell*, 867 P.2d at 80; *Witt*, 136 F.3d at 1429–30.

ences must be drawn in favor of Dean Witter, the party opposed to the motion.

We therefore reverse the district court's grant of summary judgment in favor of VALIC on the contractual claim.

## III. Fraud and Promissory Estoppel Claims

The gravamen of Dean Witter's fraud and promissory estoppel claims is that for almost two weeks after November 2, 1998, VALIC repeatedly and falsely informed Mrs. Bass that it was in the process of stopping payment on Check I and would reissue a replacement check to her, when in fact it did not do so until November 16, when it was too late. Evidence was submitted that as late as November 12, Kathleen Rutherford, a VALIC customer service employee, informed Mrs. Bass that the stop payment request on Check I would be taken care of—even though the thief had already cashed Check I and it had cleared VALIC's bank no later than November 10. These dates take on particular significance because the thief did not begin depleting the fraudulent account until November 24. Dean Witter alleges that had VALIC provided accurate responses to Mrs. Bass and Dean Witter during early to mid-November, the theft could have been prevented. The promissory estoppel claim similarly asserts that Mrs. Bass relied on VALIC's assurances and reassurances that the check would be stopped and did not further pursue the missing check until it was negotiated and the thief began to deplete the account.

The district court dismissed the fraud claim, stating: "Mrs. Bass's reliance on VALIC overlooks Dean Witter's role in permitting the loss to occur," and that "Dean Witter's conduct must be considered in determining the viability of the claim." Op. 4–5. Similarly, in dismissing

the promissory estoppel claim the district court held:

> Plaintiff's argument that the loss was caused by Mrs. Bass's detrimental reliance on VALIC overlooks Dean Witter's own conduct. Dean Witter accepted Check I from an imposter, endorsed the check, and deposited it [in] a fraudulent account. As set forth above, Dean Witter was in a superior position to have prevented the loss, and any reliance by Mrs. Bass on VALIC's representations was not the cause of the loss.

Op. 8.

We do not disagree that Dean Witter's role in the affair must ultimately be taken into account, but we cannot agree with the district court that this justified summary judgment in favor of VALIC on the fraud and promissory estoppel claims. Dean Witter sues in its capacity as Mrs. Bass's assignee. The common law has long maintained that an assignee stands in the shoes of the assignor. *See Tivoli Ventures, Inc. v. Bumann,* 870 P.2d 1244, 1248 (Colo.1994); 2 W. Blackstone, *Commentaries on the Laws of England* 327 (1769) ("[I]n assignments [the assignor] parts with the whole property, and the assignee stands to all intents and purposes in the place of the assignor."). Thus, when Dean Witter brings a claim as an assignee of Mrs. Bass, the law conceptualizes the matter as if Mrs. Bass, not Dean Witter, stands before the court. Dean Witter's own role in the affair no more vitiates its legal claim in its capacity as assignee than its conduct would vitiate Mrs. Bass's claim if she had brought it herself.

To the extent that the district court's ruling was based on its judgment that "Dean Witter was in a superior position to have prevented the loss," such a finding oversteps the role of the court on motion for summary judgment. Both parties submitted evidence tending to show that the

other party was the primary cause of the loss, and the weighing of this conflicting evidence is in the province of the jury.

To the extent that assignment has roots in equity, it might be argued (though VALIC has not raised the point in these terms) that the equitable doctrine of "clean hands" would preclude Dean Witter from proceeding against VALIC (on the factual assumption Dean Witter was to some extent responsible for the loss). *See, e.g., Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.,* 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945) (equitable maxim that "he who comes into equity must come with clean hands" vests court with discretion to close "the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant"). However, since the later part of the nineteenth century, courts have tended to view written executions of assignment as legal acts devoid of the attending equitable considerations. *See, e.g., Cochran v. Stewart,* 21 Minn. 435 (1875) (notes of indebtedness are assignable without attending equitable defenses). One court has explained that while the "root of all subrogation lies in equity, the doctrine's modern day off-spring, which is the basis for the instant action, is statutory and contractual in nature.... [T]he general business conduct of the plaintiff subrogee is irrelevant to a determination of whether the subrogee can recover for the insured loss suffered by the subrogor." *Florists' Mut. Ins. Co. v. Ludvig Svensson, Inc.,* 2003 WL 1856552 at *8 (W.D.Va. Apr.9, 2003). In keeping with this trend, the Colorado Court of Appeals has held:

> Assignment is distinguished from subrogation in that subrogation is an act of the law predicated on payment of the debt or claim, and operates only to secure contribution and indemnity, where-

as assignment is an act of the parties depending generally on intention, and contemplates a continuation of and transfers the whole claim or debt.

*Kirkham v. Hickerson Bros. Truck Co.,* 29 Colo.App. 303, 485 P.2d 513, 516 (1971), *quoting* 6 C.J.S. *Assignments* § 2(b)12 (now reclassified as 6A C.J.S. *Assignments* § 5) (*cited with approval* in *Eckhardt v. Village Inn,* 826 P.2d 855, 860 (Colo.1992)). Here, it is undisputed that Mrs. Bass, for valid consideration, contractually assigned her claims to Dean Witter. It follows that she transferred "the whole claim or debt," unaffected by the deeds or omissions of her assignee.

The conduct of Dean Witter in its corporate capacity would not have precluded Mrs. Bass from suing VALIC if she had not assigned the claim. It therefore does not preclude her assignee from bringing the same claim. If Dean Witter's conduct contributed to the loss, as VALIC claims and the district court concluded, the proper course is for VALIC to bring some sort of claim against Dean Witter for indemnification or contribution. According to counsel's representations at oral argument, Dean Witter's conduct was brought before the district court pursuant to C.R.S. § 13–21–111.5. This statute provides a procedural mechanism whereby negligence or fault may be attributed to non-parties, thus relieving a party-defendant from the portion of liability attributed to the non-party. It is through this, or some similar procedural mechanism, rather than summary judgment against Dean Witter, that Dean Witter's own contribution to the loss, if any, should be assessed.

In addition to dismissing the case on the basis of Dean Witter's conduct, the district court also rejected the promissory estoppel claim, at least in part, on its finding that "it would ... be speculative to

conclude that VALIC could have stopped payment before Check I was cashed by Dean Witter on November 9, 1998." Op. 8. We believe that such "speculation" is within the province of the jury; only by indulging inferences in favor of the party moving for summary judgment could the possibility that VALIC could have stopped payment on a check in time be dismissed. Moreover, Dean Witter presented evidence that damages could have been prevented if the fraudulent account had been frozen before the depletion started on November 24, 1998: Mrs. Bass's reliance on VALIC's false reassurances prevented her from further investigating the whereabouts of her check and discovering that it had been negotiated by Dean Witter in Los Angeles. Based on the evidence of Mrs. Bass's diligence in determining the whereabouts of her check, a reasonable jury *could* conclude that the theft would have been prevented.

## IV. Colorado Consumer Protection Act

Dean Witter's claim under the Colorado Consumer Protection Act restates its common-law fraud claim with one significant addition: that the misrepresentations made to Mrs. Bass were part of a pervasive pattern throughout VALIC's customer service department of misinforming customers regarding the status of their accounts. In support of these allegations, Plaintiff submitted testimony from Ms. Marlene Jorgensen, a former VALIC customer service representative. According to Ms. Jorgensen, VALIC instructed her to inform customers that their requests would be processed within five to seven days, whether or not this was true. Rather than following through and solving problems, Ms. Jorgensen declared that VALIC employees were trained to give "pat" and "cookie-cutter" answers designed to summarily dispose of customer's

questions and complaints, but which ultimately proved misleading to the customers. *See* App. at 271–74.

■■■ Under Colorado law a plaintiff can maintain a private right of action under the CCPA if it can demonstrate:

(1) that the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation; (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods; (4) that the plaintiff suffered injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury.

*Hall v. Walter*, 969 P.2d 224, 235 (Colo. 1998).

The district court found that Dean Witter failed to demonstrate how VALIC's alleged wrongdoing significantly affected the public, as required by *Hall's* third factor. In granting VALIC summary judgement on the CCPA claim, the district court reasoned:

There is no evidence that VALIC's allegedly wrongful conduct in the handling of Mrs. Bass's accounts had any impact on other customers or potential customers of VALIC's services. Although Ms. Jorgensen's testimony suggests that Mrs. Bass's difficult experience with the VALIC customer service department was not an isolated occurrence, this evidence does not demonstrate the kind of public impact necessary to show a violation of the CCPA. *See Martinez*, 969 P.2d at 222–23.

Op. 7.

■■■ The district court correctly summarized the relevant legal principles set forth by the Colorado Supreme Court. However, considering the record in the

light most favorable to the party opposing summary judgment, we cannot agree with its prediction that the Colorado courts would bar a private right of action under the CCPA. This is a legal issue we review *de novo. See Salve Regina College v. Russell,* 499 U.S. 225, 231, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991) (interpretations of state law by federal district judges sitting in the forum state are not entitled to deference by the courts of appeal); *see also Steiner Corp. v. Johnson & Higgins,* 135 F.3d 684, 690 (10th Cir.1998).

In analyzing the third *Hall* factor, Colorado courts look to several further indicia to determine whether a challenged practice has significant impact on the public. These include: (1) the number of consumers directly affected by the challenged practice; (2) the relative sophistication and bargaining power of the consumers; and (3) evidence that the challenged practice has previously impacted other consumers or has significant potential to do so in the future. *Martinez v. Lewis,* 969 P.2d 213, 222 (Colo.1998).

This case admittedly presents a close question as to whether the harm allegedly experienced by Mrs. Bass is the type of public harm covered by the CCPA. On the one hand, the CCPA is to be liberally construed to effect its remedial purpose, *Hall,* 969 P.2d at 230; on the other, "[i]f a wrong is private in nature, and does not affect the public, [the] claim is not actionable under the CCPA." *See Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining,* 62 P.3d 142, 149 (Colo. 2003). In *Full Draw Productions v. Easton Sports, Inc.,* 85 F.Supp.2d 1001, 1007 (D.Colo.2000), the District of Colorado elegantly summarized the considerations relevant to *Hall's* third prong as follows:

> *Hall* and *Martinez,* companion cases recently decided by the Supreme Court of Colorado, provide the two most im-

portant guideposts for determining whether Full Draw's alleged conduct had a sufficient impact on the public as consumers to be the subject of a private suit under the CCPA. *Hall* involved a suit against real estate developers who marketed residential lots under the false pretense that lot owners would have a right-of-way across a piece of land owned by the plaintiff. 969 P.2d at 227. "[B]ecause the misrepresentations were directed to the market generally, taking the form of widespread advertisement and deception of actual and prospective purchasers", the statements significantly impacted the public as consumers. *Id.* at 235.

The opposite result was reached in *Martinez.* There, the plaintiff brought suit under the CCPA against a doctor retained by State Farm Mutual Automobile Insurance Company to perform independent medical evaluations. 969 P.2d at 215. The doctor's medical conclusion that plaintiff was "malingering" led to denial of the plaintiff's insurance claim. *Martinez,* 969 P.2d at 215. The plaintiff argued that the doctor committed a deceptive trade practice by falsely representing to State Farm that he was capable of diagnosing organic brain injury when, in fact, he was not qualified to do so. *Id.* at 220–21. Because the deception was committed against only one person, State Farm, and because the deceived party was a large, sophisticated insurance company rather than a vulnerable individual consumer, the plaintiff could not establish that the deceptive practice significantly impacted the public as consumers. *Id.* at 222.

We take further guidance from *Rhino,* which the Colorado Supreme Court decided after the district court decision in this case. *Rhino* involved claims by Snyder, a distributor, against its supplier, Rhino, and

a third-party distributor for breach of contract and tortious interference with the exclusivity provisions of Snyder's contract with Rhino. 62 P.3d at 144–45. In addition to its common law claims, Snyder asserted CCPA claims against both defendants. In holding that Snyder could not maintain an action under the CCPA, the court noted that: (1) the alleged fraud did not have significant public impact since it affected, at most, several distributors and not the general public; (2) Snyder was represented by legal counsel and was knowledgeable about the industry; (3) *Rhino's* alleged misrepresentations were limited to potential distributors rather than the general public; and (4) the alleged misrepresentations made privately to Snyder were distinguishable from the advertisements addressed to the general public at issue in *Hall. Id.* at 150.

▮ Reviewing *Hall, Martinez,* and *Rhino* leads us to conclude that a Colorado court would find Dean Witter to have presented sufficient evidence to survive summary judgment on its CCPA claim. The issue before us is not whether another VALIC customer is likely to be subjected to the lost check fiasco endured by Mrs. Bass, but rather whether similarly situated customers will be subjected to misleading information in the future. The allegedly misleading information seems to have been supplied by the customer service center responsible for servicing account information inquiries from the general public. VALIC manages over two million "participant accounts." App. 327. In just one four-state region, VALIC processes over 600 transfer requests per month, and assuming the truth of Ms. Jorgensen's statements for purposes of summary judgment, the misinformation disseminated by the customer service department could potentially affect large numbers of VALIC customers. Many of VALIC's customers lack significant financial expertise, particularly

as contrasted with the resources at VALIC's disposal, and they are unlikely to be represented by counsel in their day-to-day dealings with VALIC.

To be sure, Dean Witter is a long way from proving the truth of Ms. Jorgensen's allegations. The testimony of one former employee may not be sufficient to implicate an entire organization in a persistent pattern and practice of misinforming its clients. Moreover, on remand, VALIC may challenge any of the factual assumptions made by the Court in analyzing the relative sophistication and bargaining power of VALIC *vis-a-vis* its customers. At this point, however, we are at the summary judgement stage, and thus decide all facts and draw all inferences in favor of Dean Witter. *Jones v. Barnhart,* 349 F.3d 1260, 1265 (10th Cir.2003). "[O]ur role is simply to determine whether the evidence proffered by plaintiff would be sufficient, if believed by the ultimate factfinder, to sustain [a] claim." *Id.; Foster v. Alliedsignal,* 293 F.3d 1187, 1194–95 (10th Cir.2002) (federal court sitting in diversity applies federal summary judgment standards). We find that it is.

### V. Breach of Fiduciary Duty

▮ Finally, Dean Witter alleges that because VALIC failed to ensure the safe delivery of the checks to the requested address, VALIC was in breach of its fiduciary duty to Mrs. Bass. The district court dismissed this claim, finding that no fiduciary relationship existed between Mrs. Bass and VALIC, and that there can be no breach of fiduciary duty unless the duty is first established. *See Moses v. Diocese of Colorado,* 863 P.2d 310, 320 (Colo.1993). We agree.

In *Paine, Webber, Jackson, & Curtis, Inc. v. Adams,* 718 P.2d 508 (Colo.1986), the Colorado Supreme Court held that a stockbroker/customer relationship is not "*per se,* fiduciary in nature." *Id.* at 517.

Rather, the court looked to the circumstances defining the relationship between the broker and the client. Relying on *Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 461 F.Supp. 951 (E.D.Mich.1978), the Colorado Supreme Court contrasted cases in which the broker makes investment decisions, acts as an advisor to the clients, and initiates trades in the account without a client's approval or notice (in which a fiduciary relationship was said to exist), with cases in which the broker merely facilitates the transactions requested by the client, provides limited financial or managerial advice, and maintains no discretion regarding the composition of the client's portfolio. In the latter cases, no fiduciary relationship was found. *See Paine Webber*, 718 P.2d at 515–18; *Leib*, 461 F.Supp. at 953–55.

Colorado courts have similarly held that, absent a showing of special circumstances, a lending institution will not be considered the fiduciary of its customers. *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359, 1365 (Colo.Ct.App. 1994). *Wells Fargo* contrasted the typical banking arrangement with cases where "there is a repose of trust by the customer along with an acceptance or invitation of such trust on the part of the lending institution." *Id.* (internal citations and quotations omitted). Quoting the Montana Supreme Court, *Wells Fargo* concluded that:

[A] fiduciary relationship [between bank and lender] may result from the development of a special relationship akin to an advisor/advisee. This special relationship must exist before a fiduciary duty arises.

. . . .

[N]o fiduciary duty arises between a bank and its borrower where the bank did not offer financial advice, its advice was not always heeded, or where the borrower was advised by others, such as legal counsel.

*Id.* (quoting *Simmons Oil Corp. v. Holly Corp.*, 258 Mont. 79, 852 P.2d 523, 526 (1993)) (brackets and ellipses in original; emphasis removed); *see also ADT Operations, Inc. v. Chase Manhattan Bank, N.A.*, 173 Misc.2d 959, 662 N.Y.S.2d 190, 192 (N.Y.Sup.Ct.1997) (under New York law, normal commercial relationship between bank and client does not constitute fiduciary relationship).

Based on these principles, we affirm the district court's finding that VALIC was not Mrs. Bass's fiduciary. VALIC was not authorized to unilaterally sell or purchase any securities or investments on behalf of Mrs. Bass, nor did it control her investment decisions. Mrs. Bass met with VALIC representatives for only about half an hour each year and did not receive significant investment advice from her broker. *Id.* We further reject Dean Witter's argument that VALIC's undertaking to deliver the monies to the Houston office created a fiduciary relationship. This action is devoid of any of the criteria used by Colorado courts to determine fiduciary status, and quite to the contrary, shows that VALIC's distribution of the funds occurred only pursuant to Mrs. Bass's written instructions. Our review of Colorado law leads us to believe that no reasonable jury could find VALIC Mrs. Bass's fiduciary.

## VI. Conclusion

Based on the analysis presented above, we REVERSE the district court as to the contract, fraud, promissory estoppel, and CCPA claims, and REMAND these claims for further consideration. With regard to the bailment and fiduciary claims, the opinion of the district court is AFFIRMED.

Roberta LANGLEY, Plaintiff–
Appellant,

v.

Jo Anne B. BARNHART, Commission-
er, Social Security Administra-
tion, Defendant–Appellee.

No. 03–7088.

United States Court of Appeals,
Tenth Circuit.

June 30, 2004.

Catherine Taylor of Perrine, McGivern, Redemann, Reid, Berry & Taylor, P.L.L.C., Tulsa, OK, for Plaintiff–Appellant.

Sheldon J. Sperling, United States Attorney; Cheryl R. Triplett, Assistant United States Attorney; Tina M. Waddell, Regional Chief Counsel; Michael McGaughran, Deputy Regional Chief Counsel; and Amy J. Mitchell, Assistant Regional Counsel, Office of the General Counsel, Region VI, Social Security Administration, Dallas, TX, for Defendant–Appellee.

Before EBEL, ANDERSON, and BRISCOE, Circuit Judges.

EBEL, Circuit Judge.

Claimant Roberta Langley appeals from a district court order adopting the magistrate judge's recommendation to affirm the Commissioner's denial of her application for Social Security disability benefits. Claimant contends on appeal that the administrative law judge (ALJ) did not properly evaluate the opinions of her treating physicians and erred in determining that she does not have any severe impairments. We reverse and remand for further proceedings.[1]

## BACKGROUND

Claimant applied for disability benefits on June 1, 2000, claiming an inability to work since December 1, 1997, due to rheumatoid arthritis, chronic fatigue, chronic headaches, depression, and reflux disorder. The Commissioner has established a five-step sequential evaluation process for determining whether a claimant is disabled. See Williams v. Bowen, 844 F.2d 748, 750–52 (10th Cir.1988). In this case, the ALJ determined that claimant was not disabled at step two of the evaluation process. At step two, it is the claimant's burden to demonstrate an impairment, or a combination of impairments, that significantly limit her ability to do basic work activities. See Bowen v. Yuckert, 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); 20 C.F.R. § 404.1521. After considering the medical evidence and conducting a hearing, the ALJ found that claimant had not met this burden.

## STANDARD OF REVIEW

We review the Commissioner's decision to determine whether the correct legal standards were applied and whether the Commissioner's factual findings are supported by substantial evidence in the record. Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir.2003). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (quotation omitted). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." Bernal v. Bowen, 851 F.2d 297, 299 (10th Cir.1988). This court may "neither reweigh the evidence nor substitute our judgment for that of the agency." Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir.1991).

---

1. After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. See Fed. R.App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

## EVALUATION OF TREATING PHYSICIAN OPINIONS

On appeal, claimant first contends that the ALJ failed to apply correct legal standards in evaluating the opinion of one of her treating physicians, Dr. Hjortsvang, and her treating psychiatrist, Dr. Williams. She contends the ALJ failed to afford their opinions proper weight and to provide specific, legitimate reasons for rejecting their opinions. We agree.

### Treating Physician Rule

According to what has come to be known as the treating physician rule, the Commissioner will generally give more weight to medical opinions from treating sources than those from non-treating sources. 20 C.F.R. § 404.1527(d)(2). "In deciding how much weight to give a treating source opinion, an ALJ must first determine whether the opinion qualifies for 'controlling weight.'" *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir.2003). To make this determination, the ALJ:

> must first consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. If the answer to this question is 'no,' then the inquiry at this stage is complete. If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. [I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight.

*Id.* (quotations omitted); *see also* § 404.1527(d)(2).

Even if a treating physician's opinion is not entitled to controlling weight, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [§ ] 404.1527.'" *Id.* (quoting Social Security Ruling (SSR) 96–2p, 1996 WL 374188, at *4).

Those factors are:

(1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* at 1301 (quotation omitted).

"Under the regulations, the agency rulings, and our case law, an ALJ must give good reasons ... for the weight assigned to a treating physician's opinion," that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight." *Id.* at 1300 (quotations omitted). "[I]f the ALJ rejects the opinion completely, he must then give specific, legitimate reasons for doing so." *Id.* at 1301 (quotations omitted).

### Dr. Hjortsvang's Opinion

Dr. Hjortsvang, who treated claimant for several months, completed a medical source statement in which he reported that claimant has fairly severe degenerative joint disorder with limited movement in her legs, knees, hips, and shoulders. Dr. Hjortsvang stated that claimant suffers from chronic pain and has limited mobility and decreased balance. Dr. Hjortsvang also reported that claimant can frequently lift only ten pounds; stand or walk less than one hour in an eight-hour

day; sit three hours in a typical day, and can never climb, balance, kneel, crouch, or crawl, and can only occasionally stoop, reach, handle, or finger objects. Dr. Hjortsvang stated that he based his assessment of her limitations on his shoulder examinations of claimant showing she experienced pain when her shoulder was extended only ninety to one-hundred degrees and his observation that she usually walked with a stoop.

The ALJ rejected Dr. Hjortsvang's report, stating that his "opinion is wholly unsupported by the claimant's medical records, and, frankly, is ridiculous. There is no objective medical evidence of any impairment which could be expected to cause such limitations." Aplt.App. at 29. The ALJ found that Dr. Hjortsvang "did not describe a medically determinable impairment that could reasonably cause such limitations," and that his assessment was not well-supported by clinical signs because he failed to reference any medical reports that supported his conclusions or indicate how his treatment of claimant supported his conclusions. *Id.* The ALJ stated that Dr. Hjortsvang's "assessment is clearly based upon the claimant's subjective complaints" and that "[h]is own treatment records clearly do not support his pessimistic functional assessment." *Id.* The ALJ wrote, "[a]ll in all, I find his account of the claimant's limitations to be more an act of courtesy to a patient, rather than a genuine medical assessment of discrete functional limitations based upon clinically established pathologies." *Id.* The ALJ found that Dr. Hjortsvang's assessment was unsupported by, and inconsistent with, the credible evidence of record, and declined to give it controlling weight.

 Although claimant contends that Dr. Hjortsvang's opinion was entitled to controlling weight, she does not dispute the ALJ's finding that Dr. Hjortsvang's report is not well-supported by medically acceptable clinical and laboratory diagnostic techniques. Neither Dr. Hjortsvang's treatment notes nor his medical source statement indicate that he performed diagnostic tests to evaluate claimant's severe degenerative joint disease, such as X-rays, joint taps, magnetic resonance imaging, a bone scan, or computed tomography. Therefore, we conclude the ALJ was entitled to give Dr. Hjortsvang's report less than controlling weight. *See Watkins,* 350 F.3d at 1300.

The ALJ was not entitled, however, to completely reject Dr. Hjortsvang's opinion on this basis. As noted above, even if a treating physician's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of the [relevant] factors." *Id.* (quotation omitted).

> [A]djudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected.

*Id.* (quoting SSR 96–2p, 1996 WL 374188, at *4). Here, contrary to the requirements of SSR 96–2p, the ALJ completely rejected Dr. Hjortsvang's opinion once he determined it was not entitled to controlling weight, without any consideration of what lesser weight the opinion should be given or discussion of the relevant factors set forth in § 404.1527.

Moreover, some of the reasons given by the ALJ for rejecting Dr. Hjortsvang's opinion are not supported by the record. Contrary to the ALJ's finding, Dr. Hjortsvang's medical records *do* describe medically determinable impairments that could

reasonably cause the described limitations. He stated in his medical source statement that claimant has severe degenerative joint disease with limited movement in her legs, knees, hips, and shoulders, and he states in all of his treatment records that claimant suffers from, among other things, osteoarthritis and migraine headaches. Aplt.App. at 514, 516, 521, 522, 539. Further, Dr. Hjortsvang did indicate the basis of his assessment: shoulder examinations showing pain on abduction and his observation that she walked with a stoop.

Also contrary to the ALJ's finding, Dr. Hjortsvang's opinion is not "wholly unsupported" by the medical record. Dr. Hjortsvang's treatment notes consistently report that claimant is stiff, and has pain and limited mobility in her knees, hips, and shoulders, and he consistently prescribed medication for her joint disease. Consistent with these observations, Dr. Blaschke reported in 1997 that "some inflammatory rheumatic disease must be present since not only does [claimant] have impingement at both of her shoulders to account for a lot of her shoulder pain but she has got a synovitis at her right shoulder as well as synovitis at both ankles and in her right knee." *Id.* at 228. We do not mean to suggest that there are not conflicts in the medical evidence; the record does include reports from examining and consulting physicians who found no objective signs that claimant has rheumatoid arthritis or any autoimmune disorder. Nevertheless, the record does not support the ALJ's finding that Dr. Hjortsvang's opinion is "wholly unsupported" by the medical record. *Id.* at 29.

The ALJ also improperly rejected Dr. Hjortsvang's opinion based upon his own speculative conclusion that the report was based only on claimant's subjective complaints and was "an act of courtesy to a patient." *Id.* The ALJ had no legal nor

evidentiary basis for either of these findings. Nothing in Dr. Hjortsvang's reports indicates he relied only on claimant's subjective complaints or that his report was merely an act of courtesy. "In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and *not due to his or her own credibility judgments, speculation or lay opinion.*" *McGoffin v. Barnhart,* 288 F.3d 1248, 1252 (10th Cir.2002) (quotation omitted; emphasis in original). And this court "held years ago that an ALJ's assertion that a family doctor naturally advocates his patient's cause is not a good reason to reject his opinion as a treating physician." *Id.* at 1253.

Thus, the ALJ did not follow the correct legal standards in considering Dr. Hjortsvang's opinion, nor are the ALJ's reasons for completely rejecting his opinion supported by substantial evidence.

### Dr. Williams

Dr. Williams, a psychiatrist, treated claimant for several months for depression. Dr. Williams completed a medical source statement opining that claimant had marked or moderate limitations in every category relating to understanding and memory, concentration and persistence, social interaction and adaptation, indicating that her depression seriously affects her ability to function independently, appropriately, and effectively. Dr. Williams stated that claimant "is caught in a vicious cycle of major depression and chronic severe pain that make it impossible for her to work." Aplt.App. at 536.

The ALJ declined to give Dr. Williams's assessment controlling weight, finding that it was unsupported by, and inconsistent with, the credible evidence of record. The

ALJ stated that Dr. Williams's opinion was "not supported by the objective evidence in this case, including his own records." *Id.* at 31. Repeating the same boilerplate phrase he used to reject Dr. Hjortsvang's opinion, the ALJ stated, "[a]ll in all, I find [Dr. Williams'] account of the claimant's limitations to be more an act of courtesy to a patient, rather than a genuine medical assessment of discrete functional limitations based upon clinically established pathologies." *Id.*

 The ALJ provided a facially valid reason for not giving Dr. Williams's opinion controlling weight: that it was not consistent with other substantial evidence in the record. We find no obvious inconsistencies, however, between Dr. Williams's opinion and either his treatment notes or the other evidence in the record relating to claimant's depression. In his treatment notes, Dr. Williams diagnosed claimant with major depressive disorder with psychosis and with pain disorder. *Id.* at 529, 530, 531. He noted that she was depressed, though not suicidal or delusional, and noted that claimant hears voices. Dr. Williams prescribed anti-psychotic medication.[2] He described claimant as being logical and coherent, with no gross cognitive problems, but also noted that she had a restricted range of affect and difficulty concentrating. Dr. Williams also stated in his treatment notes that claimant is unable to work. *Id.* at 496.

As to the ALJ's statement that Dr. Williams's opinion is not based on "a genuine medical assessment of discrete functional limitations based upon clinically established pathologies," *id.* at 31, we note "that a psychological opinion may rest either on observed signs and symptoms or on psychological tests," *Robinson v. Barnhart,* 366 F.3d 1078, 1083 (10th Cir.2004) (citing 20 C.F.R. Subpart P, App. 1 § 12.00(B)). Thus, Dr. Williams's observations about claimant's functional limitations do constitute specific medical findings. *See id.*

Nor do we see obvious inconsistencies between Dr. Williams's opinion and the medical records of other examining physicians. A consulting physician, Dr. Sutcliffe, noted that claimant's history suggests she has depressive disorder. He concluded that claimant has diminished immediate and short term recall, "certainly" lacks the cognitive ability to do complicated tasks, such as beautician work or driving a school bus, has a diminished ability to tolerate routine stressors, and might prefer to be alone and withdrawn. Aplt. App. at 238. Dr. Sutcliffe rated claimant's global assessment of functioning (GAF) score at 53, indicating moderate symptoms.[3] Another examining psychiatrist, Dr. Layeni, reported that claimant suffers from major depressive disorder, hears voices, has poor concentration, lethargy, hopelessness, guilt, decreased interest, and

---

2. The ALJ stated that claimant quit taking this medication. We do not find support for this statement. Rather, the treatment records indicate that Dr. Williams discontinued one anti-psychotic medication when claimant complained it made her feel like a zombie, but noted that claimant agreed to try another anti-psychotic medication, and later prescribed a different anti-psychotic medication. *Id.* at 532, 530.

3. The GAF is a subjective determination based on a scale of 100 to 1 of "the clinician's

judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed.2000) at 32. A GAF score of 51–60 indicates "moderate symptoms," such as a flat affect, or "moderate difficulty in social or occupational functioning." *Id.* at 34. A GAF score of 41–50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *Id.*

situational panic attacks. Dr. Layeni rated claimant's GAF score at 50, indicating serious symptoms.

Because the ALJ failed to explain or identify what the claimed inconsistencies were between Dr. Williams's opinion and the other substantial evidence in the record, his reasons for rejecting that opinion are not "sufficiently specific" to enable this court to meaningfully review his findings. *Watkins*, 350 F.3d at 1300 (quotation omitted). Without further clarification, the reason given by the ALJ for not giving Dr. Williams's opinion controlling weight does not appear to have been supported by the record.

Furthermore, as with Dr. Hjortsvang, the ALJ did not follow through with the remainder of the analysis, that is, to specify what lesser weight, if any, should be assigned to the medical opinion, using all of the factors set forth in § 404.1527. *See id.* at 1301. And, also as with Dr. Hjortsvang, it was improper for the ALJ to reject Dr. Williams's medical opinion based upon the ALJ's speculative and unsupported conclusion that it was "an act of courtesy to a patient." Aplt.App. at 31.

Thus, the ALJ did not follow the correct legal standards in considering Dr. Williams's opinion, and absent clarification from the ALJ on remand, the reasons he gave for rejecting this opinion do not appear to be supported by substantial evidence.

## STEP TWO DETERMINATION

 Claimant next contends the ALJ erred in finding that she did not have a severe impairment or combination of impairments at step two of the evaluation process. She argues the ALJ's finding is not supported by substantial evidence because he failed to give proper weight to the medical evidence and to consider the cumulative medical evidence. Again, we agree.

The Supreme Court has adopted what is referred to as a "de minimus" standard with regard to the step two severity standard: "[o]nly those claimants with slight abnormalities that do not significantly limit any 'basic work activity' can be denied benefits without undertaking" the subsequent steps of the sequential evaluation process. *Yuckert*, 482 U.S. at 158, 107 S.Ct. 2287 (O'Connor, J., concurring); *see also* 20 C.F.R. §§ 404.1520(c), 404.1521(a). Basic work activities are "abilities and aptitudes necessary to do most jobs," 20 C.F.R. § 404.1521(b), including "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgement, responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting." Social Security Ruling 85–28, 1985 WL 56856 at *3.

The step-two severity determination is based on medical factors alone, and "does not include consideration of such vocational factors as age, education, and work experience." *Williams*, 844 F.2d at 750. As discussed above, the ALJ did not follow the correct legal standards in evaluating the weight to be afforded the medical opinions of Dr. Hjortsvang and Dr. Williams, and many of the ALJ's factual findings with respect to those opinions are either not supported by substantial evidence in the record or are insufficiently specific to allow meaningful review. For this reason, there is not substantial evidence to support the ALJ's determination that claimant's impairments are not severe.

Moreover, the ALJ's decision does not indicate that he considered the cumulative effect of claimant's impairments. At step two, the ALJ must "consider the combined effect of all of [the claimant's] impairments

without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523. If the claimant's combined impairments are medically severe, the Commissioner must consider "the combined impact of the impairments ... throughout the disability determination process." *Id.*

The record shows that claimant suffered from joint disease or fibromyalgia, as well as chronic fatigue, migraines or chronic headaches, depression, and reflux disorder. The ALJ was required to assess the combined impact of these impairments to determine the effect, if any, they had on plaintiff's ability to do work-related activities. His failure to do so requires reversal of the decision.

Because the Commissioner did not apply the correct legal standards and her findings are not supported by substantial evidence in the record, we must remand this case for further proceedings. The judgment of the district court is REVERSED and this case is REMANDED to the district court with instructions to remand, in turn, to the Commissioner for further proceedings consistent with this order and judgment.

**DIRECTV, INC., a California corporation, Plaintiff–Appellant,**

v.

**Mike TREWORGY, Defendant–Appellee.**

No. 03–15313.

United States Court of Appeals, Eleventh Circuit.

June 15, 2004.

Douglas C. Spears, Adams & Spears, PA, Orlando, FL, for Plaintiff–Appellant.

M. Richardson Hyman, Charleston, SC, Robert S. Apgood, Seattle, WA, for Defendant–Appellee.

Joseph C. Metcalfe, Eugene, OR, Cindy A. Cohn, San Francisco, CA, for Amicus Curiae.

Before ANDERSON, HULL and PRYOR, Circuit Judges.

PRYOR, Circuit Judge:

The issue presented by this interlocutory appeal has produced disagreement among the district courts both in this circuit and elsewhere: whether 18 U.S.C. section 2520(a), as amended in 1986, provides a private right of action against persons who possess devices used to intercept satellite transmissions in violation of 18 U.S.C. section 2512(1)(b), a criminal offense. This Court is the first court of appeals to address this issue. DIRECTV, Inc. (DTV) argues that it has a private right of action against Mike Treworgy for his alleged possession of these illegal devices. The district court, however, granted Treworgy's motion to dismiss that count of the complaint. Because we find that the plain language of section 2520(a) does not create a private right of action against a person who possesses a device in violation of section 2512(1)(b), we affirm the district court and remand for further proceedings consistent with this opinion.

## I. FACTS AND PROCEDURAL HISTORY

DTV provides satellite television programming to millions of subscribers. DTV encrypts its satellite transmissions to prevent the unauthorized viewing of pay-per-view and premium programs. The customers of DTV purchase access devices from DTV to decrypt the satellite transmissions.

Some individuals illegally circumvent these security measures and intercept the satellite transmissions without paying any fees to DTV. Often these individuals are aided by companies that market "pirate access devices," which allow users to decrypt the satellite transmissions of DTV. The intentional manufacture, distribution, possession, and advertising of pirate access devices is a criminal offense. 18 U.S.C. § 2512.

DTV obtained from Fulfillment Plus, a California-based mailing facility, records that showed that Treworgy purchased two pirate access devices, a "PT2 Pocket Pal Programmer" and a "PT2 Pocket Pal Upgrade Chip," from a company that shipped those devices to him through Fulfillment Plus. DTV then sued Treworgy in the district court and alleged that Treworgy possessed and used these pirate access devices in violation of sections 2512(1)(b) and 2511(1), respectively. DTV alleged that section 2520(a), as amended by the Electronic Communications Privacy Act of 1986 (Wiretap Act), created a private right of action against a person in possession of access devices in violation of section 2512(1)(b). Treworgy moved to dismiss that count of the complaint on the ground that section 2520(a) does not create a private right of action against persons in possession of pirate access devices.

The district court granted Treworgy's partial motion to dismiss. The parties then moved jointly for certification of this interlocutory appeal, under 28 U.S.C. section 1292(b). The district court granted that motion, and we accepted this interlocutory appeal. We are now presented with the question whether section 2520(a) provides a private right of action against a person who possesses pirate access devices in violation of section 2512(1)(b).

This question has produced divergent rulings. Several district courts have held that section 2520(a) creates a private right of action for the violation of section 2512(1)(b). See, e.g., Directv, Inc. v. Drury, 282 F.Supp.2d 1321, 1323–24 (M.D.Fla. 2003); DirecTV, Inc. v. Karpinsky, 274 F.Supp.2d 918, 919 (E.D.Mich.2003); DIRECTV, Inc. v. Dougherty, No. 02–5576, 2003 U.S. Dist. LEXIS 23654, at *5–*7 (D.N.J. Oct. 8, 2003); DirecTV, Inc. v. Gatsiolis, No. 03 C 3534, 2003 U.S. Dist.

LEXIS 15801, at *5–*6 (N.D.Ill. Aug. 27, 2003); *DirecTV, Inc. v. Megar*, No. 03–20247–CIV–MARTINEZ, 2003 U.S. Dist. LEXIS 23814, at *2 (S.D.Fla. July 2, 2003). Several other district courts, in addition to the court that entered the order that is the subject of this appeal, have reached the opposite conclusion. *See, e.g., DirecTV, Inc. v. Lorenzen*, 299 F.Supp.2d 789, 792–93 (N.D.Ohio2004); *DirecTV, Inc. v. Gemmell*, 317 F.Supp.2d 686, No. CIV. A.6:03–944, 2004 WL 1048236, at *5 (W.D.La. Apr. 30, 2004); *DIRECTV, Inc. v. Cope*, 301 F.Supp.2d 1303, 1305 (M.D.Ala.2003). DTV represented in its brief that it has approximately 1800 pending complaints in the district courts of Florida in which DTV has alleged that a defendant has violated section 2512. That large number does not include the hundreds more complaints of DTV that are pending in the other district courts within the Eleventh Circuit.

## II. STANDARD OF REVIEW

The question before us is purely a matter of statutory interpretation, which we review *de novo*. *United States v. Veal*, 153 F.3d 1233, 1245 (11th Cir.1998), *cert. denied*, 526 U.S. 1147, 119 S.Ct. 2024, 143 L.Ed.2d 1035 (1999).

## III. DISCUSSION

This is the second appeal this year in which we have had to construe the language of the Wiretap Act in a case filed by DTV. *DIRECTV, Inc. v. Brown*, 371 F.3d 814, No. 03–16094, 2004 WL 1178469 (11th Cir. May 28, 2004). As in the other appeal, "[w]e begin our construction of [the Wiretap Act] where courts should always begin the process of legislative interpretation, and where they often should end it as well, which is with the words of the statutory provision." *Harris v. Garner*, 216 F.3d 970, 972 (11th Cir.2000) (en banc).

Section 2520(a) creates the following civil remedy:

> (a) In General.—Except as provided in section 2511(2)(a)(ii), any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity, other than the United States, which engaged *in that violation* such relief as may be appropriate.

18 U.S.C. § 2520(a) (emphasis added).

The possession of a pirate access device is defined separately as a criminal offense in section 2512(1)(b):

> (1) Except as otherwise specifically provided in this chapter, any person who intentionally—
>
> . . .
>
> (b) manufactures, assembles, possesses, or sells any electronic, mechanical, or other device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications, and that such device or any component thereof has been or will be sent through the mail or transported in interstate or foreign commerce; . . .

shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 2512(1)(b).

The plain language of these provisions addresses two distinct concerns. Section 2520(a) provides a civil remedy for the victim of the theft of an electronic communication. Section 2512(1)(b) provides a criminal punishment for those involved in trafficking devices used for the theft of electronic communications without need of proof that any person has yet been injured by that illegal commerce.

Because it creates a civil remedy, section 2520(a) properly defines both the victims for whose benefit the remedy exists and the offenders for whom liability is owed. The plaintiff is "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a). The defendant is "the person or entity which engaged in that violation." *Id.*

The phrase "which engaged *in that violation*" makes apparent the intent of Congress to limit liability to a certain class of defendants. 18 U.S.C. § 2520(a) (emphasis added). Congress chose to confine private civil actions to defendants who had "intercepted, disclosed, or intentionally used [a communication] in violation of ... chapter [119 of title 18.]" *Id.* As explained by one district court, "as a matter of grammar and sentence structure, the phrase 'that violation' refers to the interception, disclosure, or intentional use of communications mentioned earlier in the sentence, *and not to the possession of prohibited devices.*" *DirecTV, Inc. v. Bertram,* 296 F.Supp.2d 1021, 1024 (D.Minn. 2003) (emphasis added).

DTV proposes a tortured reading of section 2520(a). DTV argues that, under section 2520(a), a plaintiff can sue for any act "in violation of" the Wiretap Act if the plaintiff pleads that its communications have been intercepted, disclosed, or intentionally used. DTV argues that the interception of its communications gives it "standing" to sue under section 2520(a), but DTV then argues that it is irrelevant whether the defendant committed an interception that gave rise to the plaintiff's standing to sue. DTV would have us read the language "that violation" to mean *any* violation of the Wiretap Act, not only the interceptions, disclosures, or intentional uses that define the plaintiff's right of action.

This construction is also constitutionally problematic. As the Electronic Frontier Foundation, an *amicus curiae,* argues, it is difficult to understand how DTV could establish a "case" or "controversy," within the meaning of section 2 of Article III of the Constitution, which defines and limits the judicial power of federal courts, without an allegation that the wrongdoer against whom DTV seeks relief actually injured or directly threatened to injure DTV. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). Possession of a pirate access device alone, although a criminal offense, creates nothing more than conjectural or hypothetical harm to DTV. *DirecTV, Inc. v. Amato,* 269 F.Supp.2d 688, 691 (E.D.Va.2003). By adhering to the plain language of section 2520(a), we avoid, as we must, however, the constitutional problems that might arise in the construction of this statute. *Vt. Agency of Natural Res. v. United States ex rel. Stevens,* 529 U.S. 765, 787, 120 S.Ct. 1858, 1870, 146 L.Ed.2d 836 (2000).

DTV also erroneously argues that, because Congress expressly excluded violations of section 2511(2)(a)(ii) as a basis of civil liability, any other violation of the Wiretap Act gives rise to civil liability. The language of section 2511(2)(a)(ii), however, buttresses the conclusion that the liability created by section 2520(a) is confined to illegal interceptions, disclosures, and uses of electronic communications. Section 2511(2)(a)(ii) exempts from civil liability any person or agency that assists law enforcement officers in wiretap activity under a lawful order. In other words, section 2511(2)(a)(ii) provides that a narrow category of interceptions, disclosures, and uses of the electronic communications of others is lawful, and section 2520(a) then makes clear that it does not create any civil liability for persons involved in the

lawful activity defined in section 2511(2)(a)(ii).

Our reading of section 2520(a) is also consistent with the language of its earlier version, which read as follows:

> Any person whose wire or oral communication is intercepted, disclosed, or used in violation of this chapter shall (1) have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use such communications....

18 U.S.C. § 2520 (1985), *amended by* Electronic Communications Privacy Act of 1986, Pub.L. No. 99–508, § 103, 100 Stat. 1848, 1853–54 (1986). In *Flowers v. Tandy Corp.*, 773 F.2d 585 (4th Cir.1985), the Fourth Circuit held that this earlier version of section 2520 did not create a private right of action for violations of section 2512. The *Flowers* court so held in the context of a verdict won by an ex-wife against the corporation that sold a wiretapping device to her former husband.

In explaining that a private right of action did not exist under the old version of section 2520, the *Flowers* court reasoned as follows:

> Though § 2520 provides an action for any person whose communication is "intercepted, disclosed or used *in violation of this chapter*," ... the language defining the class of persons liable is not comparably broad. The statute expressly limits those against whom the private action lies to the person who "intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use such communications." This language tracks very closely the criminal offenses set out in § 2511, whereas the criminal offenses set out in § 2512 are defined in such terms as "manufacture," "assemble," "possess," and "sell." The express language of § 2520 is therefore not susceptible to a construction which would pro-

> vide a cause of action against one who manufactures or sells a device in violation of § 2512 but does not engage in conduct violative of § 2511.

*Flowers*, 773 F.2d at 588–89.

DTV wrongly contends that the change in the language of section 2520 somehow expanded what the *Flowers* court called "the class of persons liable." *Id.* at 588. The 1986 amendments streamlined the language of the statute, constricted the class of persons liable, and brought electronic communications within the coverage of the statute. Congress replaced its earlier, more verbose version with the simpler wording, "the person or entity ... which engaged in that violation." *See DIRECTV, Inc. v. Baker*, 318 F.Supp.2d 1113, No. 3:03cv1085–T, 2004 WL 1109879, at *5 (M.D.Ala. May 19, 2004) ("[L]egislative history provides no indication that the change was meant to expand the class of violations that can form the basis of a civil suit."); *DIRECTV, Inc. v. Boggess*, 300 F.Supp.2d 444, 448 (S.D.W.Va.2004) ("[I]t appears that Congress substituted the language 'engaged in that violation' for the more descriptive language contained in the superseded version without intending to change the potential class of defendants."). Congress also removed from the class of persons liable those who procured an interception, disclosure, or use of protected communications. Finally, Congress amended section 2520 to cover the interception, disclosure, or intentional use of electronic communications in addition to the wire or oral communications that were already protected from theft.

DTV urges that the existence of a private right of action for violations of section 2512(1)(b) would better effectuate the purpose of the Wiretap Act. DTV argues that the availability of this private right of action would encourage private attorneys general to aid in the enforcement of federal law. The *fundamental problem with*

this argument, however, is that "courts may not create [a private right of action], no matter how desirable that might be as a policy matter, or how compatible with the statute," because that is a determination Congress alone can make. *Alexander v. Sandoval,* 532 U.S. 275, 286–87, 121 S.Ct. 1511, 1520, 149 L.Ed.2d 517 (2001). Because the language of section 2520(a) does not create a private right of action against a person who possesses a device in violation of section 2512(1)(b), we cannot create one.

## IV. CONCLUSION

The district court correctly ruled that, in amending section 2520 of the Wiretap Act in 1986, Congress did not create a private right of action against persons in possession of access devices in violation of section 2512(1)(b). Accordingly, the judgment of the district court is AFFIRMED and this case is REMANDED to the district court for further proceedings consistent with this opinion.

Hedrick G. STONE, Jr., individually and as parent and next friend of Tiffany Stone, a minor, Diane D. Stone, individually and as parent and next friend of Tiffany Stone, a minor, Tiffany Stone, Plaintiffs–Appellants,

v.

UNITED STATES of America, Defendant–Appellee.

No. 03–16088

Non–Argument Calendar.

United States Court of Appeals, Eleventh Circuit.

June 15, 2004.

Paul S. Boone, Jacksonville, FL, for Plaintiffs–Appellants.

Todd B. Grandy, Tampa, FL, for Defendant–Appellee.

Before ANDERSON, WILSON and RONEY, Circuit Judges.

PER CURIAM:

Tiffany Stone, then a minor, was given alcohol and assaulted by three active duty naval personnel in the hotel-like transient barracks known as the Combined Bachelor Quarters ("CBQ") at the Mayport Naval Air Station in Mayport, Florida ("NAVSTA"). Her parents, joined by Stone after she reached majority, brought this Federal Tort Claims Act suit against the United States under 28 U.S.C. §§ 1346, 2671–80. When the United States asserted lack of jurisdiction under the so-called "assault and battery" exception to the 28 U.S.C. § 1346(b) waiver of sovereign immunity, 28 U.S.C. § 2680(h), the district court retained jurisdiction on the ground that plaintiffs purported to state a claim of negligence antecedent to the alleged assault. Plaintiffs' claim of negligence is based on the allegation that by promulgating standards of conduct in the Mayport barracks ("the instructions"), the United States undertook a duty to ensure that naval personnel complied with those provisions. They asserted that the United States was negligent when Seaman Coby Portillo, who was staying in the CBQ, saw Stone enter the barracks past the normal visiting hours but did not speak to her or otherwise challenge her entry, did not notify proper authorities, and thus failed to enforce the instructions concerning the use of the barracks, which prohibited underage drinking, as well as guest visitation after 10:00 p.m. Thereafter, the district court, in a thorough and well-reasoned opinion, entered summary judgment for the United States by holding that, under Florida law, the United States owed no duty of care to Stone under the voluntarily-adopted instructions, or otherwise. We affirm.

The Federal Tort Claims Act was "designed to provide redress for ordinary torts recognized by state law." *Ochran v. United States*, 273 F.3d 1315, 1317 (11th Cir.2001) (internal quotation and citation omitted). As the alleged tort here occurred in Florida, Florida tort law applies. "To state a claim for negligence under Florida law, a plaintiff must allege that the defendant owed the plaintiff a duty of care, that the defendant breached that duty, and that the breach caused the plaintiff to suffer damages." *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1262 (11th Cir.2001). Whether, under Florida law, the United States has a duty to protect civilian guests from acts committed by naval personnel residing at the CBQ turns on whether the United States voluntarily undertook "to do an act that if not accomplished with due care might increase the risk of harm to others or might result in harm to others due to their reliance upon the undertaking confers a duty of reasonable care, because it thereby 'creates a foreseeable zone of risk.'" *Union Park Mem'l Chapel v. Hutt*, 670 So.2d 64, 66–67 (Fla.1996) (quoting *McCain v. Florida Power Corp.*, 593 So.2d 500 (Fla.1992)).

Plaintiffs argue that the government's duty in this case arises from Naval Mayport Instruction 11103.3 concerning the use of the CBQ which, they contend, man-

dated that Portillo challenge the presence of Stone and notify NAVSTA authorities that Stone was on the CBQ's premises outside of the guest visiting hours. NAVSTA voluntarily implemented the "Instruction" for "all personnel who are berthed or have occasion to visit the CBQ at NAVSTA Mayport." The intent of the instruction is to "attempt to insure maximum provisions for the health, welfare and morale of each CBQ resident." Instruction 11103.3 further states the following in relevant part:

1. *Alcoholic Beverages*

a. The possession and use of alcoholic beverages is allowed in CBQ rooms and lounges as permitted by state law; in the state of Florida, one must be 21 years of age. . . .

. . .

c. Drunkenness and/or abuse of alcoholic beverages will not be tolerated. . . .

. . .

28. *Guests/Visitors*

. . .

b. All guests must be escorted at all times by the sponsor. Appropriate conduct and bearing of guests or visitors is the responsibility of the host residents. Visiting hours will be 0800 to 2200 on weekdays and 0800 to 2400 on weekdays and holidays. Unauthorized guests must be challenged by residents and staff to ensure adequate security within the buildings. . . .

c. Guests, of the same or opposite sex, are permitted in private rooms during the hours outlined above. . . . Guests are strictly prohibited in any CBQ spaces outside permitted hours. . . .

In order to determine whether Instruction 11103.3 creates a duty to Stone as a matter of law in Florida, we construe the instruction based on its plain meaning. *See, e.g., Charter Fed. Sav. & Loan Assoc., West Point, Ga. v. Office of Thrift Supervision,* 912 F.2d 1569, 1581 (11th Cir. 1990). A review of the language reveals that the "purpose" of the instruction was to "establish policy, procedures and standards governing the operation, management, utilization and maintenance of" the CBQ. The "Background" section of this instruction states, "The operation of Navy Bachelor Quarters significantly impacts morale, retention and mission performance. . . . Efficient management of Navy Bachelor Quarters maintains high standards of service to the residents, protects the Navy's substantial investment in facilities, and reduces operation costs." The CBQ's manager, Joanne Farrelly, testified that Instruction 11103.3 was promulgated to provide guidance to Mayport naval personnel residing in the barracks, attempting to protect these personnel and the millions of dollars of property at the Mayport facility. The guest visiting hours provision of the instruction, for example, states that "[g]uests are permitted in the CBQ, provided that these guest visits do not interfere with good order and discipline or inconvenience other occupants."

Accordingly, it appears from a plain reading of the instruction that its purpose was not to create a duty of care to visiting civilian guests of the CBQ, but instead was intended to protect governmental equipment and the comfort of military personnel visiting the CBQ. Nothing in this instruction indicates that civilians were encouraged to visit the CBQ so as to create an assumption of duty by the United States under Florida law to protect Stone. Stated differently, as to Portillo, who was merely a military guest in the barracks on the same footing as the three seaman who assaulted Stone, there was no legal duty owed to Stone, a civilian guest.

Under Florida law, an owner of a premises has no duty to protect an invitee from the willful criminal act of another unless that conduct could have been foreseen or anticipated. *See Doe v. United States,* 718 F.2d 1039, 1042 (11th Cir.1983) (noting that plaintiff's failure to show previous similar criminal acts committed upon postal patrons indicated that such crimes were not foreseeable so as to create a duty on the part of the government under Florida law); *see also Hardy v. Pier 99 Motor Inn,* 664 So.2d 1095, 1097 (Fla. 1st DCA 1995) (noting that motel not liable for the conduct of a third party on premises that causes injury unless injurious conduct "is reasonably foreseeable to the hotel"). Here, the plaintiffs have failed to show that the United States could have foreseen or anticipated the actions of the three naval personnel involved in the assault. It should be noted that the three men were discharged from the service, convicted of their crimes, and sentenced to varying terms of imprisonment.

Therefore, plaintiffs have failed to establish that there was a duty on the part of the United States to protect Stone from the acts committed by the military guests in the barracks. As such, there can be no claim for negligent failure to perform a duty.

Because the United States could not be found negligent as to Tiffany Stone, the district court did not err by holding that her parents' derivative loss of consortium claims likewise failed as a matter of law. *See, e.g., Faulkner v. Allstate Ins. Co.,* 367 So.2d 214, 217 (Fla.1979) (holding no derivative loss of consortium claim without alleged injured's ability to recover in the first instance).

AFFIRMED.

Marcia WILLIAMS, Plaintiff–Appellant,

v.

BELLSOUTH TELECOMMUNICATIONS, INC., Defendant–Appellee.

No. 03–14386.

United States Court of Appeals, Eleventh Circuit.

June 16, 2004.

Kenneth Lee Cleveland, Cleveland & Cleveland, Birmingham, AL, for Plaintiff–Appellant.

James R. Glenister, BellSouth Corp., Atlanta, GA, for Defendant–Appellee.

Before EDMONDSON, Chief Judge, HULL, Circuit Judge, and

EDENFIELD *, District Judge.

EDENFIELD, District Judge:

## I. Background

Claiming debilitating depression, appellant Marcia Williams applied for benefits under her employer's (BellSouth Telecommunications, Inc.'s) disability plan. Unconvinced that her impairments completely prevented her from working, Kemper Risk Management Services, Inc. (Kemper)—the company BellSouth hired to administer claims [1]—denied the claim because she did not meet the plan's disability definition.[2]

Invoking Employee Retirement Income Security Act (ERISA) jurisdiction, 29 U.S.C. §§ 1001, *et seq.*, Williams challenged that decision in district court. Applying the arbitrary and capricious review standard, the district court found that available medical evidence supported Kemper's non-disability determination, so it granted BellSouth summary judgment. Williams appeals, contending that: (1) the district court applied the wrong standard of review and (2) even under the arbitrary and capricious standard, the denial of benefits was improper.

## II. Analysis

### A. Standard of Review on Appeal

■ We review the district court's ruling *de novo*, applying the same legal standards that governed the district court's disposition. *Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir.2003); *Nat'l Fire Ins. Co. of Hartford v. Fortune Const. Co.*, 320 F.3d 1260, 1267 (11th Cir.2003).

### B. ERISA Review Standard

■ ERISA provides no standard for reviewing decisions of plan administrators or fiduciaries. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Shaw v. Connecticut Gen. Life Ins. Co.*, 353 F.3d 1276, 1282 (11th Cir.2003); *Marecek v. BellSouth Telecomms., Inc.*, 49 F.3d 702, 705 (11th Cir.1995). But *Firestone* established three distinct standards for reviewing administrators' plan decisions: "(1) *de novo* where the plan does not grant the administrator discretion [*i.e.*, does not exercise discretion in deciding claims;] (2) arbitrary and capricious [where] the plan grants the administrator [such] discretion; and (3) heightened arbitrary and capricious where [the plan grants the administrator such discretion but] ... [he has] ... a conflict of interest." [3] *HCA Health Servs. of Geor-*

---

* Honorable B. Avant Edenfield, United States District Judge for the Southern District of Georgia, sitting by designation.

1. Kemper is a company independent of BellSouth. Prior to its contract for Kemper's services, BellSouth processed its own claims.

2. BellSouth's plan defines "Disability" as "a medical condition which makes a Participant unable to perform any type of work as a result of physical or mental illness or an accidental injury."

3. *Firestone* actually addressed the standard for judicial review of an administrator's plan interpretations (*i.e.*, its interpretation of what plan provisions mean), whereas here we are dealing with a plan administrator's factual determinations (*i.e.*, that Williams was in fact not disabled under the plan because she was not completely unable to work). Courts, however, read *Firestone* broadly, applying its three levels of review to both plan interpretations and factual determinations. *Shaw*, 353 F.3d at 1284–85; *Torres v. Pittston Co.*, 346 F.3d 1324 (11th Cir.2003); *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1451 (11th Cir.1997) ("[W]e consistently have upheld application of the abuse of discretion standard of review to determinations involving both plan interpretations and factual findings under ERISA"). Sometimes courts complicate this area by employing a third term, "plan adjudication," which can encompass plan interpretation, a factual determination, or both.

---

For clarity, we avoid use of the term "adjudication" here.